UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA

CRIMINAL ACTION

VERSUS

NO. 13-108-JJB-SCR

MICHAEL ROBERTSON

## RULING ON MOTION TO SUPPRESS

This matter is before the Court on the Defendant Michael Robertson's Motion (rec. doc. 18) to Suppress Evidence. The United States of America (the "Government") opposes the motion. Rec. doc. 22. The Court conducted a suppression hearing on October 28, 2013, and each party filed post-hearing memorandums. Rec. docs. 26 & 28. Furthermore, each party submitted additional briefing pursuant to this Court's order. Rec. docs. 31, 34, & 35. For the reasons stated herein, the Defendant Michael Robertson's Motion (rec. doc. 18) to Suppress Evidence is **GRANTED**.

### Background

The Court makes the following factual findings based on the evidence presented at the October 28, 2013 suppression hearing, including testimony from the arresting officer, Corporal Aaron Spelying, and a dash camera recording of the events. On March 11, 2013 at approximately 10:45 p.m., Corporal Aaron Spelying witnessed the Defendant Michael Robertson traveling at 70 miles per hour on I-12 Westbound, between Sherwood Boulevard and Airline Highway in Baton Rouge. Rec. doc. 25, p. 5–6. The posted speed limit in that area is 60 miles per hour. Rec. doc. 25, p. 6. Corporal Spelying immediately pulled off the road shoulder and pursued the defendant. *Id.* Upon catching up with the defendant, both Corporal Spelying's and the defendant's vehicle were traveling at 75 miles per hour. Rec. doc. 25, p. 6–7. At that point, Corporal Spelying

activated his police vehicle's lights. *Id.* After driving for a short period of time, the defendant made a double lane change and exited onto Drusilla Lane. Rec. doc. 25, p. 8.

After exiting Interstate 12, the parties pulled into the parking lot of the Lake After Hours on Drusilla Lane. *Id.* Upon stopping, Corporal Spelying used his public-address system to have the defendant exit the vehicle and walk to the front of the police cruiser. *Id.* Corporal Spelying immediately noticed that the defendant had a strong odor of burnt marijuana on his person. Rec. doc. 25, p. 9. The defendant did not have a driver's license, but he did have a Louisiana identification card. *Id.* The defendant also informed Corporal Spelying that the vehicle had been rented by the defendant's wife. *Id.* Corporal Spelying then approached the defendant's vehicle, at which point he made contact with the passenger in the vehicle. Rec. doc. 25, p. 10. When the passenger opened the door, Corporal Spelying again noticed a "real strong odor of burnt marijuana." Rec. doc. 25, p. 10.

Corporal Spelying returned to his police cruiser to check if there were any outstanding warrants, if the vehicle was stolen, and if any party had a valid driver's license. *Id.* This search revealed that there were no outstanding warrants, the car was rented by the defendant's wife, and neither party had a valid driver's license. Rec. doc. 25, p. 10–11. But, the defendant did have a suspended license. Rec. doc. 25, p. 11. The database search also disclosed that both the defendant and his passenger were convicted felons. Rec. doc. 25, p. 15–16. During his database search and based on his concerns from the burnt marijuana odor, Corporal Spelying called for backup. Rec. doc. 25, p. 10–11.

After finishing his database search, Corporal Spelying asked a couple of further questions regarding the defendant's suspended license and his travel itinerary. *See* rec. doc. 25, p. 11. Corporal Spelying then returned all of the defendant's items and told the defendant that he would

not write him a ticket. *Id.* At the suppression hearing, Corporal Spelying admitted that he did not write the defendant a ticket because he wanted to potentially secure the defendant's voluntary consent to search the automobile. *Id.* Corporal Spelying proceeded to inform the defendant that there had been problems with people smuggling items on the interstate, including drugs and weapons. Rec. doc. 25, p. 11–12. The officer then asked the defendant whether his car contained any contraband. *Id.* After the defendant answered in the negative, Corporal Spelying asked the defendant if he could search the vehicle, to which the defendant responded that he could search the vehicle Rec. doc. p. 11–13. Based on the testimony and the dash camera video, less than 10 seconds elapsed between Corporal Spelying telling the defendant he would not write him a ticket and the officer asking for consent to search the vehicle. *See* rec. doc. p. 11, 24.

Upon receiving the defendant's consent, Corporal Spelying had the passenger exit the vehicle. Rec. doc. 25, p. 13. When he began to look in the vehicle, Corporal Spelying noticed that the plastic panel on the center console was ajar. Rec. doc. 25, p. 14. He removed the plastic panel and found a gun underneath. *Id.* At that point, Corporal Spelying returned to the front of the police vehicle to inform the defendant and the passenger of their rights. *Id.* Corporal Spelying asked the individuals about the "guns," despite only finding a single gun, because he was "trained that if you find one, look for a second one." Rec. doc. 25, p. 15. The passenger admitted that the gun had been purchased by his fiancé. *Id.* Despite not having a second gun at that point, Corporal Spelying proceeded to ask "who's the other one for," at which point the passenger nodded to the defendant and the defendant acknowledged that he owned the other gun. *Id.* Both the defendant and the passenger admitted to smoking marijuana, and the officer eventually located a partially-smoked marijuana cigar under the center console. Rec. doc. 25, p. 16. Corporal Spelying also located the second gun in the vehicle. *Id.*

As a result of this encounter, a grand jury indicted the defendant on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) and one count of possession of marijuana in violation of 21 U.S.C. § 844(a). Rec. doc. 1. Subsequently, the defendant filed the pending motion to suppress, in which he seeks to suppress the evidence seized during the search of his vehicle and any statements made by him. Rec. doc. 18.

**Analysis**

1. Constitutionality of the Stop's Duration

Based on the motion and post-hearing memorandums, it does not appear that the defendant is challenging the initial stop of his vehicle. Rather, the defendant asserts that the vehicle stop extended longer than was reasonably necessary. "A search and seizure must be reasonably related in scope to the circumstances which justified the stop in the first place." *United States v. Santiago*, 310 F.3d 336, 341 (5th Cir. 2002) (citing *United States v. Valadez*, 267 F.3d 395, 397–98 (5th Cir. 2001); *Terry v. Ohio*, 392 U.S. 1, 19–20 (1979)). Officers should employ the least intrusive investigative methods that are available in order to dispel their suspicions in a short time period. *Id.* (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)). Nevertheless, an officer "can request a driver's license, insurance papers, and vehicle registration" during a traffic stop. *Id.* (citing *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993)). Additionally, the officer can "run a computer check and issue a citation." *Id.* (citing *Shabazz*, 993 F.2d at 437). During the computer check, the officer is permitted to detain and question the individual subject to the traffic stop. *Id.* (citing *United States v. Dortch*, 199 F.3d 193, 198 (5th Cir. 1999)). "He may also ask about the purpose and itinerary of the occupants' trip as part of this investigation, because [courts] consider these questions to be reasonably related in scope to [the] investigation of the circumstances that caused the stop." *United States v.*

*Pack*, 612 F.3d 341, 350 (5th Cir. 2010) (citing *United States v. Brigham*, 382 F.3d 500, 506–08 (5th Cir. 2004)). Furthermore, "[a]n officer may ask questions outside the scope of the stop, but only so long as such questions do not extend the duration of the stop. It is the length of the detention, not the questions asked, that makes a specific stop unreasonable . . . ." *United States v. Machuca-Barrera*, 261 F.3d 425, 432 (5th Cir. 2001).

However, regardless of the constitutional validity of the initial stop, an officer must not extend a stop beyond the valid reasons for that stop. *Santiago*, 310 F.3d at 341 (citing *Dortch*, 199 F.3d at 198). In *United States v. Santiago*, the Fifth Circuit provided that:

> [A] Fourth Amendment violation occurs when the detention extends beyond the valid reason for the stop. Once a computer check is completed and the officer either issues a citation or determines that no citation should be issued, the detention should end and the driver should be free to leave. In order to continue a detention after such a point, the officer must have a reasonable suspicion supported by articulable facts that a crime has been or is being committed.

*Id.* at 341–42 (internal citations omitted).

The defendant relies primarily on the Fifth Circuit's decision in *Santiago*. In that case, the Louisiana State Trooper stopped a vehicle on Interstate 20 in Bossier Parish because of a "flashing light that emanated from the dash of the vehicle directly below the rear-view mirror." *Id.* at 337. After stopping the defendant's vehicle, the state trooper could identify that the source of the "flashing light" was "two golf-ball sized crystal balls hanging from either end" of the mirror. *Id.* at 338. Hanging this object from the rearview mirror potentially violated multiple Louisiana statutes. *See id.* at 339–40. The trooper also noted that there were four individuals in the vehicle: the defendant, who was driving; a woman in the passenger seat; and two female children in the back seat. *Id.* at 338.

Through conversation with the defendant and his wife, as well as through review of vehicle documentation, the officer began to notice discrepancies in the defendant's and his wife's

stories. *See id.* at 338. The trooper testified at the suppression hearing that he had an "uneasy feeling" due to the discrepancies, but "that he had no specific suspicion that [the defendant] was transporting drugs, though he hadn't ruled out the possibility." *Id.* at 338–39. Nevertheless, the trooper did have concerns that the car was either stolen or the children in the backseat had been abducted. *Id.* at 339. As a result of his concerns, the officer performed a database check on the defendant and his wife, but those checks came back negative. *Id.*

As per his testimony at the suppression hearing, the officer "had three main concerns during the stop: 1) that the children may have been abducted; 2) that the car may have been stolen; and 3) that the couple may have been transporting illegal narcotics." *Id.* After the driver's license and criminal history checks came back negative, the trooper admitted that he was satisfied regarding the first two concerns. *Id.* But, he still had concerns over whether the defendant was transporting illegal narcotics. *Id.* Nevertheless, at this point in their encounter, the trooper told the defendant that he could leave, but he needed to remove the object from his mirror. *Id.* "[B]ut before he let [the defendant] go, he told [the defendant] that a lot of illegal contraband was being smuggled down the interstate highways." *Id.* The trooper informed the defendant that he noticed the defendant was from a town that was a major source of methamphetamine and that the defendant was headed to Atlanta, which "was known to be a major distribution point of narcotics." *Id.* The Fifth Circuit noted that the record did not reflect that the state trooper had returned the defendant's paperwork. *Id.* at 343. It was at that point that the trooper asked the defendant "whether he had any illegal contraband on his person or in the vehicle," to which the defendant answered in the negative. *Id.* at 339. Going one step further, the trooper asked the defendant "if he minded whether he searched the vehicle to make sure," which

the defendant answered in the affirmative and signed a consent-to-search form in Spanish. *Id.* Through the vehicle search, officers located approximately 21 pounds of cocaine. *Id.*

In finding that the cocaine should be suppressed, the Fifth Circuit upheld the validity of the initial stop of the vehicle. *Id.* at 342 (citing *Dortch*, 199 F.3d at 198). But, the Fifth Circuit found that the "original justification for the stop ended . . . at the time the computer check was completed." *Id.* (citing *Dortch*, 199 F.3d at 200). "At that point, there was no reasonable or articulable suspicion that [the defendant] was trafficking in drugs, but [the trooper] nonetheless continued his interrogation after the original justification for the stop had ended." *Id.* (citing *Dortch*, 199 F.3d at 199–200). As a result, the Fifth Circuit found "it was unreasonable for [the trooper] to continue to detain [the defendant] after the records check was completed and the extended detention violated [the defendant's] Fourth Amendment rights." *Id.*

In this case, Corporal Spelying testified that he originally pulled the defendant over for speeding, but upon making contact with the defendant, he smelled a strong odor of burnt marijuana both on the defendant's person and in his vehicle. Rec. doc. 25, p. 9–10. Based on the video shown at the hearing, after Corporal Spelying concluded his database check and exited the police vehicle, he appears to question the defendant about his suspended license. *See* rec. doc. 25, p. 11. Corporal Spelying also asked the defendant where he was headed, and the defendant replied that he was headed to see his brother. *See id.* Shortly thereafter, the officer informed the defendant that he was not going to write him any tickets. *See* rec. doc. 25, p. 11–12.

The question presently before the Court is whether Corporal Spelying extended the traffic stop beyond the valid reasons for the stop by asking the defendant further questions after completing the database search. *See Santiago*, 310 F.3d at 341 (citing *Dortch*, 199 F.3d at 198). In this case, based on the circumstances, the Court finds that the detention of the defendant did

not extend beyond the valid reason for the traffic stop. Corporal Spelying pulled the defendant over for speeding, and then immediately noticed an odor of burnt marijuana on the person of the defendant and emanating from his vehicle. While the initial purpose of the traffic stop was the defendant's speeding, Corporal Spelying developed a reasonable suspicion that marijuana was present in the vehicle. "An officer's subsequent actions are not reasonably related in scope to the circumstances that caused him to stop the vehicle if he detains its occupants beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011) (quoting *Pack*, 612 F.3d 350) (internal quotation marks omitted). While "uneasy feelings" and inconsistent stories do not rise to the level of articulable facts, the odor of marijuana on both the defendant's person and in his vehicle is an articulable fact that marijuana was present in the vehicle, which would constitute "additional criminal activity." *See id.* Corporal Spelying had articulable facts giving rise to a reasonable suspicion regarding the marijuana, as opposed to the trooper in *Santiago* who had "no reasonable or articulable suspicion that [the defendant] was trafficking in drugs." *Id.* (citing *Dortch*, 199 F.3d at 199-200). Accordingly, Corporal Spelying's continued detention of the defendant to ask him questions regarding his suspended license and his travel itinerary did not violate the Fourth Amendment.

2.  Voluntariness of Consent

Because the duration of the traffic stop did not constitute a Fourth Amendment violation, the paramount concern becomes whether the defendant voluntarily consented to the search of his vehicle. As the evidence shows, Corporal Spelying conducted a warrantless search of the defendant's vehicle, which uncovered the guns and burnt marijuana cigar. "The Fourth Amendment . . . prohibits a search of the vehicle in the absence of a warrant, with only two

8

exceptions." *United States v. Mendoza-Gonzalez*, 318 F.3d 663, 666 (5th Cir. 2003) (citing *United States v. Ross,* 456 U.S. 798, 809 (1982); *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)). "The agents must have either the consent of the owner to conduct the search or probable cause to believe that the vehicle contains contraband or other evidence of a crime." *Id.* (citing *Ross*, 456 U.S. at 809; *Schneckloth*, 412 U.S. at 219). While Corporal Spelying did smell the odor of burnt marijuana, the officer nonetheless informed the defendant that he would not be writing him a ticket. At the hearing, Corporal Spelying admitted that he did this in order to get the defendant's willful and voluntary consent. Rec. doc. 25, p. 11. Corporal Spelying asserted that he did not want the defendant "to think that the ticket was weighed against whether or not he was going to give . . . consent to search." Rec. doc. 25, p. 26. Corporal Spelying wanted "to take the ticket out of the equation." *Id.* In fact, Corporal Spelying went on to provide the following in response to a question regarding when the defendant was free to leave: "As soon [as] I handed him everything back, [and] told him I wasn't writing him a ticket, he was free to leave." Rec. doc. 25, p. 27. Therefore, based on the evidence and testimony, this Court finds that the officer did not objectively have probable cause to search the vehicle, as the officer was not going to write the defendant a ticket for any conduct and—based on his objective conduct—was going to allow the defendant to leave the scene. While the officer testified that he would have kept the car if the defendant had refused to consent to the search, that is mere speculation, and the Court is not here to deal with speculation of what Corporal Spelying might have done under alternative circumstances. Rec. doc. 25, p. 30. Accordingly, while the officer did have sufficient reasonable suspicion to extend the stop, the objective evidence is that Corporal Spelying never developed the requisite probable cause that the vehicle contained contraband or other evidence of a crime.

Therefore, in order to potentially justify the warrantless search, the Court must evaluate the voluntariness of the defendant's consent.

"This court considers six factors in evaluating the voluntariness of consent to search, all of which are relevant, but no one of which is dispositive or controlling." *United States v. Solis*, 299 F.3d 420, 436 (5th Cir. 2002) (citing *United States v. Kelley*, 891 F.2d 1464, 1470 (5th Cir. 1993)). The six factors are:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his or her right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*United States v. Tijerina*, 272 Fed. Appx. 378, 380 (5th Cir. April 3, 2008) (citing *Solis*, 299 F.3d at 436 n.21).

Based on the evidence presented at the suppression hearing, this Court finds that the defendant did not voluntarily consent to the search of his vehicle. After questioning the defendant regarding his travel itinerary and suspended license, Corporal Spelying did return the defendant's identification card and other relevant paperwork and informed the defendant that he would not be writing him a ticket. While Corporal Spelying never told the defendant specifically that he was "free to leave," that does not necessarily invalidate consent, as the Supreme Court previously ruled that it would "be unrealistic to require police officers to always inform detainees that they are free to go before a consent to search may be deemed voluntary." *Ohio v. Robinette*, 519 U.S. 33, 39–40 (1996). Therefore, the fact that Corporal Spelying did not explicitly inform the defendant that he was "free to leave" does not in and of itself invalidate the consent.

Nevertheless, looking at the totality of the facts, this Court determines that the defendant's consent was not voluntary. After returning the items and informing the defendant

that he would not be writing a ticket, Corporal Spelying asked the defendant, "Listen, *before you go*, we got a problem with people smuggling stuff on the interstate: guns, drugs, stuff like that. You ain't got nothing like that in the car, do you?" Then, after the defendant answered in the negative, Corporal Spelying asked, "*Before you go*, can I search your car?" The officer used the phrase "before you go" twice, to preface both of his questions regarding whether the defendant's vehicle contained any contraband and whether the officer could search the vehicle. The Court finds the officer's use of the phrase "before you go" to preface multiple questions, including asking for the defendant's consent, was a coercive police procedure. The Court echoes the reasoning from the United States District Court for Colorado in *United States v. Gastellum*, where the district judge provided:

> In this instance, I find that the defendant's purported consent was not sufficiently voluntary for several reasons. First, the question that immediately preceded the request to search was coercive. Specifically, by using the words—"*Before you go*, do you have any weapons in the vehicle"—the inference is that the defendant was not in fact free to leave. By definition one is not free to leave if "before he goes" he is first required to answer some questions. Since the request to search immediately followed this question, it was quite reasonable for the defendant to assume that the request came with the same implicit modifier (i.e. "Before you go, do you mind if I look in your vehicle...."). If such was the case, then the purported "request" to search was not a request but rather a condition that the defendant was required to satisfy before he was in fact free to leave. In short, under these circumstances and given the language employed by the officer, the "request" was both confusing and coercive. The government's position is not saved by dissecting the encounter word-by-word in an attempt to show that the request was technically sound. As the directive of the Tenth Circuit states, I look at the "totality of the circumstances," not the semantical or technical meaning of each word employed.

927 F.Supp. 1386, 1389 (D. Colo. May 24, 1996). In *Gastellum*, the officer previously informed the defendant he was "free to leave," but the district court still invalidated the consent. *Id.* at 1389–90. In the present case, Corporal Spelying never actually informed the defendant that he was "free to leave." Another significant distinction in these cases is that in the present matter the

11

officer prefaced the request for consent with the phrase "before you go," whereas in *Gastellum* the officer did not preface the request for consent with that phrase. Thus, not only was the question regarding whether the defendant had contraband prefaced with "before you go," but Corporal Spelying used it again when asking the defendant whether he would consent to the search of his vehicle. Thus, based on the foregoing, the Court finds that the officer engaged in a coercive police procedure when obtaining consent, and thus, the second factor of the six-factor test weighs in favor of invalidating the defendant's consent.

Nonetheless, the coercive nature of the officer's use of the phrase "before you go" is not the sole factor in favor of invalidating the defendant's consent to the search. First, the Court finds that the officer and the defendant were not engaging in a consensual encounter at the time he provided consent. Instead, a reasonable person would not believe he was free to leave based on the fact that the officer never specifically informed the defendant that he was free to leave, and the officer prefaced each of his questions with the coercive phrase "before you go," leaving a reasonable person to believe he could not leave without answering the questions. The Fifth Circuit previously cited to language from a Tenth Circuit case, wherein the Tenth Circuit stated that "[i]f the driver does receive the license, registration, and any other material back that he needs to be on his way, 'a driver is illegally detained only if the driver has an objective reason to believe that he was not free to end his conversation with the law enforcement official' and leave." *United States v. Sanchez-Pena*, 336 F.3d 431, 443 (5th Cir. 2003) (quoting *United States v. Turner*, 928 F.2d 956, 958 (10th Cir. 1991)). After questioning him further—which this Court previously found did not constitute an unconditional extension of the traffic stop—Corporal Spelying returned the defendant's relevant paperwork and informed the defendant that he would not be writing the defendant a ticket. Yet, he never informed him that he could leave. Rather, the

12

officer asked the defendant, "Listen, before you go, we got a problem with people smuggling stuff on the interstate: guns, drugs, stuff like that. You ain't got nothing like that in the car, do you?" Then, to further emphasize that the defendant could not leave until he answered the questions, Corporal Spelying asked, "Before you go, can I search your car?" This Court finds that a reasonable person would not believe he was free to go at that moment, but rather, that he needed to answer the questions prior to leaving. As a result, the Court finds that the defendant was not engaged in a consensual encounter with the officer at the time of allowing the officer to search the vehicle, and thus, the first factor in the six-factor consent test also weighs in favor of finding that the defendant did not voluntarily consent to the search of his vehicle.

Further, while there is no specific evidence of this fact, the defendant likely knew that incriminating evidence could be found in the vehicle, because he apparently knew there were multiple guns in the vehicle and took steps to hide those guns in the center console. *See* rec. doc. 25, p. 14–17. Additionally, a burnt marijuana cigar was found concealed in that same center console. The fact that the defendant took steps to hide the gun and marijuana cigar shows the he likely knew that incriminating evidence was located in the vehicle, and that also militates against a finding of voluntariness.

Turning to the fourth and fifth factor, there does not appear to be sufficient evidence in the record for this Court to determine that these factors favor either the Government or the defendant. Accordingly, neither the fourth factor nor the fifth factor weighs in favor of either party.

It is true that the video and evidence reveals that the defendant appears to be cooperating with the officer throughout the entire encounter. Thus, the third factor weighs in favor of finding that he voluntarily consented. Nonetheless, this factor is just one of the six factors, and "[n]o

single factor in [the] test is dispositive." *United States v. Hernandez*, 279 F.3d 302, 307 (5th Cir. 2002) (citing *United States v. Jones*, 234 F.3d 234, 242 (5th Cir. 2000)). Based on the totality of the circumstances, this Court finds that the six-factor test weighs in favor of finding that the defendant did not voluntarily consent to the warrantless search of his vehicle. Accordingly, the evidence seized and any statements made during the search of the defendant's vehicle on March 11, 2013 must be suppressed, as the warrantless search of the defendant's vehicle violated the Fourth Amendment.

**Conclusion**

Therefore, the Court **GRANTS** the Defendant Michael Robertson's Motion (rec. doc. 18) to Suppress Evidence.

Signed in Baton Rouge, Louisiana, on April 17, 2014.

_____

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**